509 F.2d 913
 CALUMET FEDERAL SAVINGS AND LOAN ASSOCIATION OF CHICAGO, a
corporation of the United States of America,
Plaintiff-Appellant,
v.
LAKE COUNTY TRUST COMPANY, a corporation of Indiana, as
Trustee under Trust Agreement dated February 1,
1966, and known as Trust No. 1217 et
al., Defendants-Appellees.
CALUMET FEDERAL SAVINGS AND LOAN ASSOCIATION OF CHICAGO, a
corporation of the United States of America,
Plaintiff-Appellee,
v.
E. J. LEWIS INVESTMENT CO., INC., et al., Defendants-Appellants,
and
Hil-Budd Corporation, Defendant-Appellee et al.
 Nos. 74--1117 and 74--1118.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 20, 1974.
Decided Jan. 17, 1975.
Rehearing Denied Feb. 19, 1975.
 
 Paul R. Hoffman and J. Stirling Mortimer, Chicago, Ill, for Calumet fed. sav.
 Joseph D. Anderson, South Bend, Ind., for E. J. Lewis Inv.
 Harvey J. Barnett, Chicago, Ill, for Lake Country Tr.
 Before HASTINGS, Senior Circuit Judge, and STEVENS and SPRECHER, Circuit Judges.
 SPRECHER, Circuit Judge.
 
 
 1
 There are two major questions raised by the two consolidated appeals of this diversity case. First, whether the mortgage held by the plaintiff, Calumet Federal Savings and Loan Association of Chicago (Calumet), was in default, and second, whether and to what extent Hil-Budd Corporation (Hil-Budd) as holder of a second mortgage on the subject properties was entitled to damages because of Calumet's failure to give them thirty days notice of intent to foreclose, pursuant to an agreement between the two. Since these two appeals arise from the same set of transactions, they have been consolidated and we deal with the facts together.
 
 
 2
 * In early 1966 Hil-Budd negotiated a construction loan with defendant-borrowers[1] in the amount of $192,307.64.[2] These funds were to be used for the construction of homes on 25 parcels in Meadowdale Subdivision, Michigan City, Indiana and were secured by a blanket mortgage. Borrowers' note was to be paid in full by January 31, 1967 and to bear interest at 6 percent per annum from February 1, 1966. In addition, upon any event of default, interest from that time was to accrue at the rate of 2 percent per month. The Hil-Budd mortgage went into default no later than December 1966.
 
 
 3
 Prior to the Hil-Budd mortgage, on January 18, 1966 Calumet issued a letter of commitment addressed to Hil-Budd in which it promised to make 25 $8,000 mortgage loans on the Meadowdale properties. Calumet in January 1967 declined to honor this commitment because its appraisers informed them that the improvements on the subject properties did not meet the terms and conditions of the commitment agreement.
 
 
 4
 Subsequent to this, a meeting of the parties was held in Chicago. Calumet agreed to make the 25 $8,000 loans. In regard to each loan, a 6 percent note was given by borrowers calling for monthly payments of $58 per month[3] with payments to begin April 30, 1967.[4] Calumet further required as part of the compromise agreement that a collateral pledge of $37,500 ($1,500 for each loan) be deposited with it to further secure the 25 notes and mortgages.
 
 
 5
 Hil-Budd received $156,875 from the proceeds of the Calumet loan and there was then left a balance of approximately $30,000 on the Hil-Budd loan. Since federal regulations required that Calumet have a first lien, Hil-Budd agreed to subordinate its first mortgage on the property to Calumet's individual mortgages. In consideration for Hil-Budd agreeing to accept a junior status Hil-Budd and Calumet executed the following agreement:
 
 
 6
 In consideration of the subordination of Hil-Budd's prior mortgage, as aforesaid, the Association has agreed and hereby confirms its agreement, that in the event any default shall exist, in any of the Association's $8,000 mortgage loans, or in the notes evidencing the same, or the mortgages serving the same, the Association will give Hil-Budd written notice of such default and 30 days to cure such default prior to the Association's institution of foreclosure proceedings upon its said mortgages.[5]
 
 
 7
 The first payments on the subject notes and mortgages were due in June 1967. The monthly payment for each parcel was $58 for principal and interest and $40 for the tax and insurance escrow. Borrowers paid $2,920 in August 1967 and were in default from the start.
 
 
 8
 In August 1968, proceeds of the previously established pledge accounts were applied to cure the delinquencies on the various loans. Calumet took the position that the pledged savings account had to be maintained at the full level. Stock in the name of Anna Lewis and Georgiana Shinn was deposited with Calumet with the understanding that if the money to replenish the pledge accounts was not forthcoming within 30 days, the stock would be sold. Pursuant to that agreement the stock was sold and $5,300 was applied to further delinquencies on loan accounts and the balance was applied to the pledge accounts.
 
 II
 
 9
 On March 4, 1969 Calumet filed a foreclosure actions on all 25 of its loans to borrowers. Hil-Budd immediately sought to have the action dismissed or in the alternative be granted summary judgment, pleading that the action should not have been filed until they had received 30 days notice of Calumet's intent to foreclose and an opportunity to cure.[6] Calumet affirmatively opposed Hil-Budd's motions on the grounds that an agent of Hil-Budd had represented to Calumet that Hil-Budd had sold its interest in these properties and that therefore notice was no longer necessary.[7] Given the dispute as to whether Hil-Budd had waived its right to notice the district judge denied the motions to dismiss and for summary judgment.[8]
 
 
 10
 On January 25, 1972 the district judge entered an order finding that Hil-Budd was entitled to notice from Calumet before the filing of its foreclosure actions. Although the court determined that a restoration of Hil-Budd's priority would not be appropriate, it reserved the question of the precise formula to be used in calculating Hil-Budd's damages. In a later order the district judge determined that Hil-Budd was entitled to receive from Calumet the present amounts due upon its notes that remained unsatisfied after the foreclosure sale, which were subsequently determined to total $119,652.34. Calumet appeals from this decision.
 
 
 11
 The district judge also found that at the time the foreclosure actions were filed that there was a delinquency of approximately $300 on each of the 25 loans and that Calumet had acted within its rights with respect to borrowers in accelerating the entire balance due and instituting foreclosure proceedings. It is from the confirmation of the foreclosure sales which borrowers appeal.
 
 III
 
 12
 In No. 74--1118, borrowers raise numerous issues with regard to whether the foreclosure action by Calumet was proper. We consider the more substantial arguments individually.
 
 
 13
 Borrowers put forth most vigorously the assertion that they were entitled to 30 days notice from Calumet before a foreclosure action could be commenced. They argue that Al Shinn, one of the named defendants, was at the January 19th Chicago meeting in his capacity as guarantor of the Hil-Budd note and as representative of the Shinn family interests (borrowers), and that they therefore were also entitled to the 30 days notice that Calumet promised Hil-Budd before foreclosure.
 
 
 14
 The trial judge correctly concluded that borrowers were not entitled to the 30 days notice before the foreclosure action was begun. Testimony by Al Shinn to the contrary was discredited by the statements of other witnesses. The district judge's conclusion on this point is supported by both the record and reason.
 
 
 15
 Lester Rosen, an attorney for Hil-Budd, which was neutral in the dispute between Calumet and borrowers, testified that Al Shinn had nothing to do with obtaining the 30 days notice provision. (Sept. 1971 Tr. 27--28). Similarly, Thaddeus Walczak and J. Stirling Mortimer, witnesses for Calumet, testified that no discussion was had with Al Shinn at the January 19, 1967 meeting with regard to a 30 days notice requirement. (Tr. 183--84, 207). It appears that it was sometime after the meeting that Rosen called Mortimer, Calumet's attorney, and indicated that as consideration for agreeing to subordinate its mortgage, Hil-Budd wanted a 30 days notice provision. Borrowers not only had no need for a notice provision because as the primary debtor they were continuously aware of any default in payments, but also, unlike Hil-Budd, they had given nothing up with which to bargain for a notice provision. Borrowers were only third-party beneficiaries of the notice agreement to the extent that Hil-Budd chose to exercise its right to cure any default so as to protect its junior position. Borrowers were not direct beneficiaries of the agreement to provide notice of default notwithstanding the fact that they were the guarantors of the Hil-Budd note.
 
 
 16
 The remainder of borrowers' arguments seek to prove that as of March 4, 1969, the date this foreclosure action was commenced, that the loans from Calumet were not in default. They contend that the first payment was not due until July 30, 1967 because the escrows did not close until June 5, 1967 and that payments were to begin the month after the closing of the escrows. Borrowers base their argument on the testimony of Carole Lewis, a Calumet loan officer at the time of the transaction. It is unclear from the record whether Lewis was stating that the escrow closed June 5, 1967 or whether that was the date on which Calumet received notice of the closing of the escrow. In any event Mr. Walczak testified that the escrow closed in May 1967 (Tr. 115) and a letter which was sent to borrowers informing them that the first payment was due on or before June 30, 1967 was introduced.[9] Given this evidence we cannot say that the district court's judgment that payment was to commence in June 1967 was clearly erroneous.[10]
 
 
 17
 Borrowers next contend that the $40 per loan required each month for the tax and insurance escrow bore no reasonable relationship to what Calumet knew was required to meet these expenses, and thus Calumet wrongfully charged funds received to these accounts rather than reducing principal and interest on the loan itself. The district judge, relying on ample evidence in the record, found that not only were the amounts in the accounts at the date of foreclosure reasonable,[11] but also that the $40 figure represented the amount agreed upon by the parties.[12]
 
 
 18
 In connection with the tax and insurance escrow, borrowers make the further argument that Calumet improperly applied $431.50 received by Calumet on January 6, 1968 and $1,000 received on April 22, 1968 from borrowers to the tax and insurance escrows. The basis of this argument is that no payments were required for these accounts prior to June 1968. Again, it is clear from Judge Grant's order and from his adoption of Calumet's figures as to the amount of delinquency, he rejected borrowers' position. As before there is ample evidence in the record for this position.[13]
 
 
 19
 Borrowers' final major contention was that the loans were not in default because of Calumet's improper actions in dealing with pledged stock and savings accounts.
 
 
 20
 At the Chicago meeting between all the parties it was agreed that Calumet would make all the loans if borrowers would establish pledged savings account in the amount of $1,500 for each loan. The borrowers take the position that these funds were meant to be used to service the mortgages during months when rentals from the subject properties fell short. Calumet on the other hand has taken the position that the agreement reached was that the funds in the pledged accounts remain at the full amount until the amount of indebtedness on each loan was reduced to $5,000 at which time Calumet would release the entire pledge account. The written pledge agreements executed by borrowers reflect Calumet's position except they do not specifically provide that amounts used to cover delinquencies must be replenished. The district judge, however, concluded that requiring borrowers to replenish depleted pledge accounts was the intent of the agreement. This conclusion is supported by the record.
 
 
 21
 Calumet's purpose in requiring the accounts would be completely defeated if borrowers could, without the risk of foreclosure, refuse to make monthly payments and rely instead on the pledge accounts. In addition Mr. Walczak, president of Calumet, testified that the use of pledged funds did not cure a delinquency (Tr. 131) and that Anna Lewis, one of the borrowers, was aware of the fact that any funds used from pledged savings accounts would have to be replenished. (Tr. 159). This was reaffirmed by the testimony of J. Stirling Mortimer who also stated that he specifically explained to Mrs. Shinn that the transfer of funds from the pledge accounts in no way cured the delinquency in the loan accounts.[14] (Tr. 244). Based on this testimony it is impossible to conclude that the district judge's resolution of this point should be upset.
 
 
 22
 Borrowers also contend that certain shares of stock pledged by Anna Lewis were wrongfully sold and that the $7,800 received should have been credited to a reduction of principal and interest on the loans themselves.
 
 
 23
 In July 1968, Calumet informed Anna Lewis, one of the beneficiaries of the trust which borrowed the money, that the accounts were $7,300 in arrears and that there would have to be payment immediately, otherwise there would be a foreclosure. Peter Candela, an accountant for Calumet, testified that they would accept her offer of certain stock as a gesture of good faith, but that if the money was not forthcoming by the end of September the stock would be sold and the proceeds would be applied to the loan delinquencies. (Tr. 365--66). Similarly, Walczak testified that the stock certificates were accepted only on a temporary basis with provisions made for its sale after 30 days (Tr. 80), and that notice was given by Calumet after this period that the stock would be sold. (Tr. 80, 230). There is thus sufficient evidence in the record to support the district judge's decision.
 
 
 24
 Candela also testified that Calumet would consider a deficiency to exist irrespective of whether the loan accounts were current if there existed a deficiency in the pledged savings accounts.[15] That some of the proceeds were used to cure delinquencies in the pledged savings accounts rather than the loans themselves was of no import, since we have previously determined that Calumet had the right to keep the savings accounts at the full $1,500 level for each loan.[16]
 
 
 25
 We have examined the remainder of borrowers' contentions and find them equally without merit. The judgment of the district court in 74--1118 is affirmed.
 
 IV
 
 26
 In No. 74--1117, Calumet appeals from the judgment of the district court awarding Hil-Budd damages because of Calumet's failure to give notice to Hil-Budd before instituting the instant foreclosure actions. It argues first that Hil-Budd was not entitled to notice and alternatively that the district judge used an improper formula in calculating Hil-Budd's damages.
 
 
 27
 After Calumet commenced this action, Hil-Budd filed a motion for summary judgment which was denied by the district judge because there existed a disputed factual issue as to whether Hil-Budd was entitled to notice and an opportunity to cure. Calumet argued that Lester Rosen, attorney for Hil-Budd, represented to Carole T. Lewis, loan agent for Calumet, that Hil-Budd no longer had any interest in the loans. In actuality what happened was that Hil-Budd had entered into a conditional sales agreement with E. J. Lewis Investment Company to sell its interest in the subject property. Lester Rosen testified that in November 1968, E. J. Lewis defaulted and the conditional sales agreement was voided. At no time did HilBudd actually convey to E. J. Lewis its mortgage. (Sept. 1971 Tr. 170). We find that the evidence in the record is sufficient to support the district judge's determination that Hil-Budd never waived its right to notice.[17] Furthermore, the district judge's determination is supported by the fact that when this action was initially filed Calumet's records still showed that Hil-Budd had an interest in these properties. This was evidenced by Calumet's action in making Hil-Budd a party to its foreclosure suit, an action that is inconsistent with Calumet's estoppel and waiver defense.
 
 
 28
 Having concluded that Hil-Budd was entitled to 30 days notice and an opportunity to cure, we next consider the appropriate relief to be granted. The district judge determined in its January 25, 1972 order that it would be inappropriate on the factual circumstances of this case to order a restoration of priority as to the Hil-Budd lien, because 'the agreement to give notice of default is merely a covenant, the breach of which would only entitle the defendant Hil-Budd to damages.'
 
 
 29
 In a subsequent order the court determined that Calumet should pay to Hil-Budd $119,625.34. This amount represented as of March 6, 1974 the total amount of borrowers' indebtedness to Hil-Budd plus a 24 percent per year penalty interest rate for amounts in default. The district judge stated:
 
 
 30
 That the proper measure of damages in favor of Hill-Budd Corporation and against plaintiff, Calumet Federal Savings & Loan Association of Chicago, is the extent to which the present amounts due upon Hil-Budd's notes are not cured or satisfied as a result of the loss of Hil-Budd's security caused by Calumet's wrongful institution of these foreclosure proceedings as against Hil-Budd Corporation.
 
 
 31
 We have determined that the above formulation does not accurately reflect Hil-Budd's actual damages on the facts of this case.
 
 
 32
 Calumet takes the position that the majority of 'wrongful foreclosure' cases apply a formula that grants as damages amounts in excess of prior liens up to the fair market value as of the date of the foreclosure sale, but in no case greater than the amount of the secondary indebtedness, Mascot v. Rudman, 37 F.Supp. 588 (D.N.H.1940); Edwards v. Smith, 322 S.W.2d 770 (Mo.1959); Munger v. Moore, 11 Cal.App.3d 1, 89 Cal.Rptr. 323 (1970), and that as of that date, in this case the values of the subject properties were insufficient to cover Hil-Budd's junior liens. Hil-Budd points out that the cases on which Calumet relies are not applicable in that they deal with situations other than the failure of the first mortgagee to inform the second mortgagee of their intent to foreclose, a situation where the second mortgagee becomes prejudiced as of the filing of the foreclosure action.
 
 
 33
 Hil-Budd in this court as it did below relies on Howe v. City Title Insurance Co., 255 Cal.App.2d 85, 63 Cal.Rptr. 119 (1967). In Howe, the court awarded 'the fair market value of (the real property security) as of the date of conversion, less prior liens and taxes, not, however, to exceed the amount due on the note,' 63 Cal.Rptr. at 122, as damages for the negligent failure to give notice to a party with a junior interest. In the present case Hil-Budd points out that on the date of conversion (the date the foreclosure action was filed) the fair market value of the properties exceeded $62,370.66, the amount by which borrowers were indebted to Hil-Budd at that time. It does not follow however, as Hil-Budd contends, that having met the Howe standards that Calumet should be liable for the substantially increased total indebtedness (due to the 24 percent penalty interest) owed as of the foreclosure sale.
 
 
 34
 It is axiomatic that Hil-Budd should not be placed in a better position through the awarding of damages than it would have been in had Calumet not breached the notice requirement. Perry v. United States, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935); United Protective Workers v. Ford Motor Co., 223 F.2d 49 (7th Cir. 1955); Irving v. Ort, 128 Ind.App. 225, 146 N.E.2d 107 (1957). If Calumet had given notice, as it was required to do, Hil-Budd would have had two options. It could have chosen not to cure in which case there would have been a foreclosure action, as occurred here, and Hil-Budd's recovery would have been limited to the amount received at a subsequent foreclosure sale in excess of Calumet's prior lien. In that case Hil-Budd would have in all probability recovered nothing.[18]
 
 
 35
 The second possibility is that Hil-Budd could have cured the deficiency. In that case they would be gambling that some time in the future borrowers would have been in a position to pay back the full amount of the loans including penalty interests and amounts advanced as curative payments. Only if this occurred would Hil-Budd have been in a position as advantageous as the district judge left them after the awarding of damages.[19] There is no evidence in the record of the likelihood of this happening. It was at best speculative as shown by the fact that borrowers had allowed both mortgages to go into default, and because of the effect of the 24 percent penalty interest making it probable that the borrowers would fall increasingly further behind in their payments. In other words, on the record before us Judge Grant's award put Hil-Budd in a substantially better position than it would have been in under either option which it could have pursued had there been no default.
 
 
 36
 Furthermore, we believe it wholly inequitable to saddle Calumet with responsibility for the amount of Hil-Budd's claim, attributable to the 24 percent penalty interest, which accrued because of borrowers' prolonged, and now found to be unwarranted, resistance to Calumet's foreclosure action. Any injury occurring after the filing of this action is attributable not to Calumet's wrongful foreclosure, but to borrowers' continued inability to repay Hil-Budd. Hil-Budd's appropriate remedy after Calumet's action was filed, and they were placed on notice as to Calumet's intent to foreclose, was to file its own foreclosure action against borrowers. This they did and their mortgage was appropriately ordered foreclosed.[20] The fact that the value received at the foreclosure sale was insufficient to cover Hil-Budd's increased payments due to the penalty interest was not Calumet's fault, but rather a contingency arising from the risk any second mortgagee undertakes.
 
 
 37
 For these reasons we decide that Calumet's liability for damages was completely determined at the date it filed its action and it should be responsible to Hil-Budd for the amount owed by borrowers as of March 4, 1969 ($62,370.66) but only to the extent that the fair market value of the subject properties exceeded the amount of prior liens, which in this case means the entire $62,370.66,[21] plus interest at the legal rate from that date.
 
 
 38
 The judgment in 74--1117 is remanded with directions.
 
 
 39
 The judgment in 74--1118 is affirmed.
 
 
 
 [1]
 Hil-Budd apparently negotiated the loans with the Lake County Trust Company and the Lee Better Builders, Inc. of Indiana. It is not clear whether all the beneficiaries of the trust held by the Lake County Trust Company were ever disclosed, but it is clear that Lee Larson, Al Shinn, Georgiana Shinn and Anna Lewis were either beneficiaries of the trust or had at some point guaranteed the loans involved. For the sake of simplicity these individuals will be referred to as borrowers
 
 
 [2]
 The actual amount distributed was $175,256.82 because of an agreed upon discount factor
 
 
 [3]
 The $58 figure does not include the money to be paid into escrow accounts for real estate taxes and insurance
 
 
 [4]
 The starting date for payments was eventually delayed until June 1967. Payments were to be made by the 15th of each month but Calumet offered a grace period until the 30th
 
 
 [5]
 Hil-Budd's agreement to subordinate its mortgage was made at the Chicago meeting, while the provision requiring notice to Hil-Budd was included in a subsequent non-dated letter. The district judge in rejecting Calumet's argument that notice need not be given because of a failure of consideration concluded that the letter containing the notice agreement 'was indeed executed and delivered prior to the consummation of the Escrow Title Company (sic) and prior to the delivery by Hil-Budd of its subordination agreement.'
 
 
 [6]
 On two previous occasions Calumet had given Hil-Budd the required 30 days notice and both times Hil-Budd made curative payments
 
 
 [7]
 Initially Calumet denominated this as their 'waiver' argument, but later said that the alleged action of the agent 'estopped' Hil-Budd from claiming the right to notice
 
 
 [8]
 Calumet put forward other arguments in support of the denial of the motions. First the previously referred to lack of consideration argument (supra, note 5) and the argument that the giving of notice was not a condition precedent to the filing of a foreclosure action, but merely a covenant the breach of which would give rise to an action for damages
 
 
 [9]
 Although at one point borrowers attempted to deny receipt of this letter, it was included with a number of loan passbooks which subsequently were found in borrower's possession
 
 
 [10]
 Although there is no specific finding on this point in any of Judge Grant's orders, his acceptance of Calumet's figures as to the amount of delinquency indicates that the district judge found for Calumet on this factual issue. Thus, at the time this action was filed, 21 monthly payments were required to have serviced these loans
 
 
 [11]
 Carole Lewis testified that the amount of the escrow payments were determined by Calumet on the basis of what would be required to pay tax and insurance liabilities. The estimate took into account other properties in the area and the fact that Calumet could not be certain of whether the existing tax rate would be maintained in light of the recent improvements made to the parcels. (Tr. 304--05). Thaddeus Walczak testified that there was a custom in the industry to have enough on hand at the time payment is required to cover the bill for the preceding year and funds for the months of the present year that had already passed. (Tr. 145--46). Further, there was evidence introduced as to the amount and at what time actual expenditures were made for taxes and insurance and the judge relied on these in making his decision
 
 
 [12]
 The borrowers contended that they owed only $20 per month per loan for the tax and insurance escrow. They rely on handwritten entries on their copies of the loan passbooks. The district judge concluded that the proper amount was $40 as evidenced by Calumet's copies of the loan passbooks. This is supported by Carole Lewis' testimony that none of the borrowers prior to the institution of these proceedings complained of the $40 figure (Tr. 311), a letter from Calumet to the E. J. Lewis Investment Co. indicating that tax and insurance escrow payments were to be $40 per loan per month (Tr. 308) and the testimony of Al Shinn that he was aware of the $40 amount and he had decided to 'let it ride.' (Tr. 1771--74)
 
 
 [13]
 Carole Lewis testified that the payments for the tax and insurance escrow were due and payable June 30, 1967. (Tr. 306). (Apparently although the taxes were due originally at this date, after one collection no further funds were applied to these accounts until January 1968.) Requiring payments for taxes which were not yet due was consistent with the custom of the industry. See note 11, supra. (Tr. 145--46). Finally two letters were introduced. The first showing that tax and insurance escrow payments were to commence in January 1968 (Tr. 308) and the second showing that by June 1968 a delinquency in the tax and insurance account existed. (Tr. 309)
 
 
 [14]
 Borrowers also argue that Calumet breached the pledge agreements by refusing to pay out earnings on the pledged savings accounts. It seems clear from the printed language on pledgor's copy of the pledge agreements that they were entitled to withdraw any interest on the pledged accounts. Although the district judge did not specifically find, it would not be unreasonable to limit their right to withdraw interest to periods when no delinquency existed in either the loan accounts or the pledge accounts. In any event Calumet's failure to pay out interest is not grounds for not allowing foreclosure especially since even with the retention of the interest the pledge accounts were still not at full level as we have determined that Calumet had a right to require
 
 
 [15]
 This point refutes borrowers' contention that the stock was wrongfully sold because pledged funds had been applied to the loans to make them current. Calumet had indicated it desired cash and accepted the stock with the condition that the cash would be forthcoming within 30 days. When no cash was paid they had the right to sell the stock pursuant to their agreement with Anna Lewis regardless of whether it was to cure a deficiency for the loans themselves or alternatively on the pledged savings accounts
 
 
 [16]
 Borrowers make the further argument that since some of the proceeds over and above the amount needed to cure the delinquencies on the loan were placed into pledge accounts not even bearing Anna Lewis' name, that Calumet was guilty of criminal conversion. There was testimony, and we find support for the conclusion, that these were inadvertent mistakes, and as far as borrowers' rights were concerned they were not prejudiced because these funds were placed into other pledged accounts bearing the names of other members of the Shinn family
 
 
 [17]
 Hilton Schwartz, president of Hil-Budd, testified that he never informed anyone at Calumet about the agreement to sell their interest in the mortgages to E. J. Lewis investment Company (Sept. 1971 Tr. 111). Lester Rosen, attorney for Hil-Budd, specifically denied that he had ever informed Carole Lewis that Hil-Budd no longer had an interest in these loans. (Sept. 1971 Tr. 172--76)
 
 
 [18]
 If Hil-Budd had failed to cure once having received notice Calumet would have proceeded with its foreclosure action. There is nothing to indicate that borrowers would have been less resolute in their opposition to the foreclosure and therefore nothing to suggest that the eventual foreclosure sale would have occurred at a substantially different time and yield a significantly different sum
 
 
 [19]
 Presumably Hil-Budd could have been in as good a position if it cured if the subject properties had increased in value. Not only was there no evidence of this, but there was evidence that some of the homes were in need of substantial repairs
 
 
 [20]
 In an order dated October 6, 1973 the district judge determined that as of March 23, 1973 borrowers were indebted to Hil-Budd in the amount of $111,437.30 and that Hil-Budd was entitled to foreclose its mortgage
 
 
 [21]
 The district judge found that as of March 4, 1969 the date of the filing of this action, the fair market value of each of the 25 lots was $12,000, that after accelerating principal and interest there was approximately $7,800 due Calumet on each of its 25 notes and that based on the foregoing there was available as security on that date in excess of $62,370.66