Stanislaw **MAJCHROWSKI** and Danuta **Majchrowski, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**NORWEST MORTGAGE, INC.** and John Does 1–10, Defendants.

No. 97 C 3831.

United States District Court, N.D. Illinois, Eastern Division.

May 19, 1998.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Ignacio Daniel Maramba, Charley Hoon Lee, Edelman & Combs, Chicago, IL, for Stanislaw Majchrowski, Danuta Majchrowski.

Thomas William Engelhardt, Ann Paton Goodman, McCullough, Campbell & Lane, Chicago, IL, Mark G. Schroeder, Briggs & Morgan, St. Paul, MN, for Norwest Mortgage, Inc.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

In recent years, the line between civil RICO, a formidable weapon authorizing treble damages and attorneys' fees, and conventional breach of contract actions has faded considerably. Put succinctly by Justice Powell, "[o]nly a small fraction of the scores of civil RICO cases now being brought implicate organized crime in any way. Typically, these suits are being brought—in the unfettered discretion of private litigants—in federal court against legitimate businesses seeking treble damages in ordinary fraud and contract cases." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 529, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (Powell, J., dissenting). There is no better illustration than the case before this Court. The Majchrowskis, representative plaintiffs in this certified class action, claim that Norwest Mortgage, their mortgage service company, violated RICO, committed unfair and deceptive practices, and breached mortgage agreements when it filed in the Majchrowskis' Chapter 13 bankruptcy proceedings a Proof of Claim that charged $66.00 in property inspection fees and a $100.00 proof of claim fee. The Majchrowskis allege that these routinely imposed "bogus" fees—which allegedly appear nowhere in the mortgage agreements—are part of a diabolical scheme to defraud and encumber the property of unwitting mortgage borrowers who find themselves in bankruptcy. Norwest vehemently denies any fraudulent activity; moreover, it insists that its standard form mortgage contracts fully authorize property inspection and proof of claim fees against defaulting borrowers who have filed for bankruptcy. Before the Court are the parties' cross-motions for partial summary judgment on the discrete issue of whether Norwest's standard mortgage contracts authorize these fees, as well as Norwest's motion to dismiss the plaintiffs' RICO claims.

### RELEVANT FACTS [1]

#### A. The Majchrowskis' Mortgage and Bankruptcy

In 1995, the Majchrowskis decided to buy a home in Illinois. They obtained a mortgage loan from Mega Mortgage Company, which then transferred the loan to Norwest for servicing. Pls.' Facts ¶ 8. In June 1996, the Majchrowskis stopped making mortgage payments. Affidavit of Scott Walker ¶ 20. In light of their failure to cure the loan default, Norwest began foreclosure proceedings against the Majchrowskis on November 11, 1996. Those proceedings were stayed when the Majchrowskis filed for Chapter 13 bankruptcy in December 1996. Later, the bankruptcy court lifted the automatic stay because the Majchrowskis were unable to make the mortgage payments required under the bankruptcy plan. *Id.* ¶¶ 21–22. The Majchrowskis' mortgage loan is currently in foreclosure. Def.'s Facts ¶ 10.

While the Majchrowskis' Chapter 13 proceedings were still pending, Norwest filed a Proof of Claim with the bankruptcy court. The "Statement of Amount Due" included,

**1.** Reflecting the different standards applicable to motions to dismiss and motions for summary judgment, the Court has derived the facts from two sources. The facts relevant to the parties' cross-motions for partial summary judgment are based on the parties' Local Rule 12M–N statements of material fact and responses, as well as the materials supporting those submissions. Those relating to Norwest's motion to dismiss the RICO claims come directly from the complaint, *see Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir.1996), although for the most part we defer discussion of the RICO facts until the analysis section.

*inter· alia,* a $100 "file proof of claim" fee, as well as a $24.75 charge for "collection property inspections" and a $41.25 charge for "foreclosure property inspections." Pl.'s Facts ¶ 9; Walker Aff. Ex. C. The legitimacy of these fees drives this entire case—the question is whether they were "authorized" by Norwest's standard form mortgage agreements.

## B. The Mortgage Agreements

The Majchrowskis executed two agreements in connection with their mortgage loan—a Multistate Fixed Rate Note ("Note") and a Uniform Security Instrument ("Security Instrument"). *See* Walker Aff. Ex. A & B. These agreements are standard form contracts that contain mostly uniform provisions, with slight variations for some jurisdictions. *See* Note ¶ 10; Security Instrument at 2. Essentially, the Note embodies the terms governing the lender's promise to loan money in exchange for the borrower's pledge to repay it with interest. The Security Instrument confirms that agreement and includes additional covenants to protect the lender "from possible losses which might result if [borrower] do[es] not keep the promises" made in the Note. Note ¶ 10; *see Ford v. Dovenmuehle Mortgage, Inc.,* 273 Ill.App.3d 240, 248, 209 Ill.Dec. 573, 651 N.E.2d 751, 757 (1st Dist.1995) (promissory note "evidenced an indebtedness only for the principal sum and interest payable"; mortgage contract both acknowledged this and "created additional obligations and indebtedness").

Both agreements have provisions for charging the borrower various fees. For example, the Note imposes "Late charges for overdue payments" (¶ 6(A)), and, if the borrower defaults and the lender chooses to accelerate payment, the Note requires the borrower to reimburse lender for "all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law ... includ[ing], for example, reasonable attorneys' fees" (¶ 6(E)). The Security Instrument reiterates the Note's late charge provision (¶ 1), and requires the borrower to pay funds into an escrow account for taxes, assessments, and insurance (¶ 2); to remedy any shortage in the escrow accounts (¶ 2); to

purchase hazard or property insurance (¶ 5); to buy mortgage insurance if the lender requires it (¶ 8); and to pay the costs of recording the discharge releasing the mortgage (¶ 22). Another protection the Security Instrument affords the lender is the right to inspect the mortgaged property upon notice to the borrower:

> **Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection. (¶ 9).

Paragraph 9 says nothing, however, about charging the borrower for inspections conducted under its provisions.

In the event the borrower defaults, or becomes involved in legal proceedings that may impair the lender's rights in the property, the Security Instrument provides the lender with sweeping remedies:

> **Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy ...), then Lender *may do and pay for whatever is necessary* to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs....
>
> Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument..... (¶ 7) (emphasis added)

Failure to cure a default on the mortgage loan further entitles the lender to "require immediate payment in full" and to "foreclose this Security Instrument by judicial proceeding." (¶ 21). The lender then has the right "to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence." *Id.*

## C. Norwest's Fees

Norwest contends that these contractual provisions, particularly paragraph 7 of the Security Instrument, authorized it to impose the proof of claim and property inspection fees in its Proof of Claim. According to Scott Walker, an assistant Vice President who manages Norwest's bankruptcy department in Charlotte, N.C., the purpose of filing a Proof of Claim in bankruptcy is to protect the secured lender's rights in the borrower's property; otherwise, he explains, the lender "would not be paid on outstanding arrearages." Walker Aff. ¶ 12. Norwest thus passed on to the Majchrowskis the cost of assembling the Proof of Claim, a service performed by a law firm with an on-site office across from Norwest's bankruptcy department.[2] Pls.' Supp. Facts ¶ 2. The firm has a contract with Norwest to prepare Proofs of Claim at a cost of $100 each.[3] Walker Dep. at 55.

The property inspections, states Walker, were likewise necessary to protect the value of and Norwest's rights in the Majchrowskis' property. Walker Aff. ¶ 18. He explains that an inspection may reveal whether the property is still occupied, whether the utilities remain connected, and whether the property has fallen into disrepair. *Id.* ¶ 16. After the Majchrowskis defaulted on the loan, Norwest hired outside vendors to inspect their property periodically. The $24.75 and $41.25 fees in Norwest's Proof of Claim represent vendor charges that Norwest claims it actually incurred and passed "straight through" to the Majchrowskis.[4] *Id.* ¶ 18. It is undisputed that Norwest did not give the Majchrowskis notice before inspecting their property,

and that the company frequently dispenses with notice when the borrower has defaulted on the mortgage loan. Walker Dep. at 179, 182.

## D. The Alleged Scheme to Defraud

Plaintiffs not only deny that the proof of claim and property inspection fees were authorized by the mortgage contracts, they take the dispute to another level—alleging elements of deception and racketeering activity under the Racketeer Influenced and Corrupt Organizations Act. In essence, plaintiffs' civil RICO claims assert that Norwest knowingly extorts these "unauthorized and bogus" charges from bankrupt borrowers in order to produce ill-gotten gains for Norwest and its corporate parents. In short, Norwest allegedly used its otherwise legitimate mortgage servicing business as a means of defrauding its customers.[5] This scheme to profit from collecting unauthorized fees was purportedly hatched by Norwest and ten of its (unnamed) corporate officers, "John Does 1–10."[6] It forced the plaintiffs to choose between paying the allegedly illegal fees or leaving them to encumber their property.

## E. The Case's Procedural Posture

Based on the above events, plaintiffs filed a five-count class action complaint in May 1997. Count I asserts a RICO claim against Norwest; Count II, a RICO claim against unnamed corporate officers "John Does 1–10"; Count III alleges unfair and deceptive practices ·in violation of· several state laws;

---

**2.** It is undisputed that the law firm employees in charge of preparing proofs of claim are not attorneys, and that final approval of the claim lies with a non-lawyer Norwest employee. Pls.' Supp. Facts ¶¶ 11–12.

**3.** Plaintiffs dispute whether Norwest "actually incurred" the $100 expense in the Majchrowskis' case, pointing out that Walker's affidavit states only that $100 is what the law firm "normally charges" Norwest. Pl.'s Resp. ¶ 8. The Court declines the invitation to delve into this fact issue in light of the narrow task given us—interpreting contract language.

**4.** Plaintiffs also quibble with whether Norwest actually incurred the property inspection fees, attacking Norwest's failure to attach documenta-

tion for these expenses. Pls.' Resp. ¶ 8. As explained above, we refuse to discuss the factual issue of what costs Norwest actually incurred, a question beyond the limited scope of our duty to construe the mortgage contracts.

**5.** We discuss the RICO allegations in greater detail in the analysis section.

**6.** Plaintiffs ·have since filed a motion to identify and serve the John Does, providing names for the previously pseudonymous defendants. The Court resolves this pending motion later in the opinion.

and Count IV claims a breach of the mortgage agreements.[7]

On July 25, 1997, plaintiffs filed their motion for class certification, defining the class as all persons who "were obligated on, or owned property secured by, a real estate mortgage or deed of trust or other security instrument"; whose loans were serviced by Norwest; and against whom Norwest assessed "file proof of claim," "collection property inspection" or "foreclosure property inspection" fees. Briefing was not completed until December 19, 1997. The Court granted plaintiffs' motion for class certification on January 14, 1998.

On September 5, 1997, the plaintiffs filed their motion for partial summary judgment, asking the Court to construe the mortgage contracts. Norwest filed its cross-motion for partial summary judgment on the same issue, as well as a motion to dismiss the RICO claims under Rule 12(b)(6), on October 17, 1997. For the reasons that follow, we deny Norwest's motion to dismiss as to Count I, but grant the motion as to Count II. Summary judgment on the contract interpretation issue is granted to Norwest, and denied to plaintiffs. We begin with Norwest's Rule 12(b)(6) motion to dismiss.

## STANDARDS GOVERNING MOTIONS TO DISMISS

A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Triad Assocs., Inc. v. Chicago Housing Auth.*, 892 F.2d 583, 586 (7th Cir.1989). The court must view all facts alleged in the complaint, as well as any reasonable inferences drawn from those facts, in the light most favorable to the plaintiff. *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir.1996); *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir.1992). Any ambiguities are likewise resolved in the plaintiff's favor. *Dawson*, 977 F.2d at 372. A complaint will not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts warranting relief. *Triad Assocs.*, 892 F.2d at 586.

These liberal pleading standards, derived from Fed.R.Civ.P. 8(a), apply with as much force to civil RICO claims as to other civil causes of action brought in federal court. *Perlman v. Zell*, 938 F.Supp. 1327, 1337 (N.D.Ill.1996) (citing *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 776 (7th Cir.1994)); *see also Haroco, Inc. v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 404 (7th Cir.1984) ("[W]e note that in our prior RICO decisions we have applied ordinary civil standards to pleadings in civil RICO cases."). Only when the predicate acts on which the RICO claim is based sound in fraud must the plaintiff meet the more exacting standards of pleading under Fed.R.Civ.P. 9(b)—and even then 9(b) applies only to pleading the particulars of those fraudulent acts. *Id.* (citation omitted). A recent RICO decision from our colleague Judge Zagel reiterated the impropriety of flouting Rule 8(a)'s dictates:

> Our Court of Appeals' flirtation with heightened pleading requirements ended in 1993 with the Supreme Court's reaffirmation of *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) [citations omitted]. Today, *Conley's* declaration that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" resonates in the Seventh Circuit: "the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir.1994).

*Butler v. Platte Valley Mortgage Corp.*, 1995 WL 875412, at *1 (N.D.Ill. Oct.25, 1995) (parenthetical omitted). This cardinal rule of pleading weighs heavily in our decision today. Despite the Court's discomfort with the plaintiffs' cagey deployment of civil RICO provisions, we are bound by Rule 8(a)'s mandate that the federal civil pleading burden is simply to set forth "a short and plain state-

---

**7.** It is not clear from the complaint whether Counts III and IV were brought against all defendants or Norwest only.

ment of the claim showing that the pleader is entitled to relief."

## ANALYSIS—RICO CLAIMS

■ Plaintiffs' RICO claims (Counts I and II) are brought under 18 U.S.C. § 1962(c), which makes it unlawful for "any person employed by or associated with [an] enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To state a claim under this section, plaintiffs must plead (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.. *Richmond v. Nationwide Cassel, L.P.*, 52 F.3d 640, 644 (7th Cir.1995) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). For purposes of its motion to dismiss, Norwest does not challenge plaintiffs' pleading of elements (3) and (4). It focuses instead on the first two prongs, arguing forcefully that plaintiffs cannot show Norwest engaged in the "conduct of an enterprise." Our synthesis of case law in this Circuit reveals that this phrase can be broken down into three pleading requirements: identifying the enterprise, demonstrating that the enterprise is distinct from the RICO "person," i.e., the defendant, and pleading that the RICO person participated in the operation or management of the enterprise. We now examine the plaintiffs' complaint for compliance with these standards.

## I. Plaintiffs' RICO Allegations

We begin with a summary of plaintiffs' RICO allegations. The complaint states that Norwest is in the consumer financing business, deriving much of its income from mortgage origination·fees and charges, sales of mortgage servicing rights, servicing mortgage loans, and secondary market sales. Norwest is a mortgage banking subsidiary of Norwest Nova, Inc., which in turn is a wholly owned subsidiary of Norwest Corporation ("NC"). Complt. ¶¶ 7–8. NC is a diversified financial services organization that provides, among other things, banking, insurance, and investment services. It has delegated control of its residential mortgage servicing business to Norwest. *Id.* ¶¶ 9–10.

. Norwest allegedly used its delegated authority over this legitimate line of business to engage in a fraudulent scheme of charging bankrupt borrowers unauthorized property inspection and proof of claim fees. "John Does 1–10," identified as corporate officers of Norwest, are alleged to be "personally knowledgeable and responsible for the[se] fraudulent practices." *Id.* ¶¶ 6; 10. Plaintiffs claim that Norwest and the John Does engaged in a "pattern of racketeering activity" by knowingly imposing and collecting these unauthorized fees through the mail (mail ·fraud) and through Proofs of Claim filed in bankruptcy court (bankruptcy fraud.) *Id.* ¶¶ 23–26. Through this activity, Norwest conducted the affairs of two "enterprises": (1) NC, its indirect parent corporation, and (2) the entire corporate group headed by NC. *Id.* ¶ 43. The John Does conducted the affairs of three enterprises through this activity: (1) Norwest, (2) NC, and (3) the corporate group headed by NC. *Id.* ¶ 55.

Plaintiffs allege that the income Norwest derives from imposing the allegedly unauthorized property inspection and proof of claim fees benefitted the enterprises: it was "upstreamed to [NC], and was reported on [NC's] financial statements." *Id.* ¶ 11. These financial statements provided the basis for NC to raise capital in public ·securities markets—capital that NC used to fund the operations of Norwest and the entire corporate group. *Id.* We find that these allegations are sufficient to maintain the RICO claim in Count I, but not in Count II. We address each Count in turn.

## II. Count I—Plaintiffs' RICO Claim Against Norwest

### A. The Complaint Identifies the Enterprise

■ First, a RICO complaint must identify the enterprise. *Richmond v. Nationwide Cassel, L.P.*, 52 F.3d 640, 645 (7th Cir.1995); *Jennings v. Emry*, 910 F.2d 1434, 1439–40 (7th Cir.1990). "Enterprise" as defined in the statute includes "any individual, partnership, corporation, association, or other legal entity ....." 18 U.S.C. § 1961(4). The Seventh Circuit has elaborated on this

formulation, characterizing an enterprise as "an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Richmond,* 52 F.3d at 644 (citation and internal quotations omitted). The enterprises in Count I, NC and the corporate group it heads, easily meet this requirement—they fall squarely within the statute's plain language as "corporation[s]" and meet *Richmond*'s continuity and structural requisites as well. *See Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 348 (N.D.Ill.1997) (enterprises "consisting of Manor Care and all its subsidiaries" are "ongoing, structured, corporate entities" under the "plain language of the statute" and *Richmond*); *Butler v. Platte Valley Mortgage Corp.,* 1995 WL 875412, at *3 (N.D.Ill. Oct.25, 1995) (corporate-group enterprise with parent corporation at the top adequately pled an enterprise). The contested questions are whether these enterprises are "distinct" from the RICO person—Norwest—and whether Norwest exercised sufficient control over their affairs.

### B. Norwest is Distinct from NC and the Corporate Group

Section 1962(c) requires the liable RICO "person" to be an entity separate from the enterprise whose affairs it conducts. *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 400 (7th Cir.1984). Termed the "distinctness" requirement, this proposition is alive and well in the Seventh Circuit, *see Emery v. American General Finance, Inc.,* 134 F.3d 1321, 1323–25 (7th Cir. 1998), despite having come under fire in other jurisdictions, *see Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 265 (3d Cir.1995). It requires the RICO person and the corporate entities in the enterprise to have "each played a distinct role within the purported scheme." *Ewing v. Midland Finance Co.,* 1997 WL 627644, at *4 (N.D.Ill. Sept.26, 1997) (citations omitted).

The Seventh Circuit adopted the distinctness requirement in *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384 (7th Cir.1984). Out of this decision came two significant holdings: (1) the RICO person and the RICO enterprise cannot be the same entity; and (2) the distinctness requirement is satisfied when the RICO person is a subsidiary and the RICO enterprise is its corporate parent. *Id.* at 399–403. The second holding is pertinent here. The *Haroco* plaintiffs claimed that the defendant bank (the RICO person) conducted the affairs of its parent corporation (the enterprise) through a fraudulent interest rate calculation scheme. Finding that these allegations met the distinctness requirement, the court remarked, "[section 1962(c)] requires only some separate and distinct existence for the person and the enterprise, and a subsidiary corporation is certainly a legal entity distinct from its parent." *Id.* at 402.

Since *Haroco,* plaintiffs have devised various pleading strategies to create the illusion of distinctness. One such artifice is to compose the enterprise using companies that, though separate from the RICO person, have no role in perpetrating or masking the alleged RICO fraud. Another is to make the RICO person a corporation and the enterprise its agents or employees. Under this scenario, the agents are usually the perpetrators, while the corporation has no distinct role in the alleged scheme. The Seventh Circuit has invalidated these conventions by requiring the RICO person to have committed the crime or fraud while conducting the enterprise's affairs, not merely its own business. *See Richmond v. Nationwide Cassel, L.P.,* 52 F.3d 640, 645–47 (7th Cir.1995).

In *Richmond,* the court held that the designated RICO persons (three car sales finance agencies that allegedly perpetrated a "forced placed insurance"[8] scheme) were not distinct from "enterprises" consisting of "a group of entities associated in fact to sell used cars and the accompanying car warranties and insurance." *Id.* at 646. Although it was clear that the defendant sales finance agencies were different entities than the various diverse companies making up the enterprises, the complaint failed to state a RICO claim because the forced placed insurance

---

8. The court defined forced placed insurance as "insurance of the defendant's choosing that pro-

vided more coverage" than the plaintiff car buyers needed. *Richmond,* 52 F.3d at 642.

fraud "beg[a]n and end[ed]" with the defendant persons. *Id.* Nothing in the complaint implicated the enterprise entities in the alleged fraud or demonstrated that the defendants had somehow used the enterprise entities to commit the fraud; the defendants were simply conducting their *own* affairs in executing the forced placed insurance scheme. *Id.* The court distinguished *Haroco,* explaining that a subsidiary conducting its parent corporation's affairs is akin to a corporate officer's conducting the affairs of the company he manages, a situation in which "we have found distinct and separate entities." *Id.* (citing cases). The court indicated conversely that distinctness is usually lacking when the enterprise consists of the RICO person's agents. *Id.* (the enterprise must be "more than an association of individuals or entities conducting the normal affairs of a defendant corporation") (quoting *Brittingham v. Mobil Corp.,* 943 F.2d 297, 302 (3d Cir.1991)).

Along the same lines, the Seventh Circuit recently determined that automobile giant Chrysler, the RICO person, was not distinct from an enterprise comprised of itself and its subsidiaries and dealers. *See Fitzgerald v. Chrysler Corp.,* 116 F.3d 225 (7th Cir.1997). Plaintiffs alleged that Chrysler had committed warranty fraud through its subsidiaries' and dealers' sales of extended warranties. *Id.* at 226. Again, these allegations failed to state a RICO claim because they did not claim that Chrysler was "empowered to perpetrate warranty fraud by selling through dealers rather than directly to the public[.] The warranty was issued by Chrysler, not by the dealers, and certainly not by other members of the Chrysler 'family.'" *Id.* at 228. The dealers had merely an incidental role in the alleged fraud and did not "lend an air of legitimacy" to an otherwise obviously illegitimate practice. *Id.* at 228–29. The court indicated that it is difficult, if not impossible, to establish distinctness when the "person" is a corporate parent and the "enterprise" consists of its subsidiaries or agents:

> [I]t is enough to decide this case that where a large, reputable manufacturer deals with its dealers and agents in the ordinary way, so that their role in the manufacturer's illegal acts is entirely incidental, differing not at all from what it would be if these agents were the employees of a totally integrated enterprise, the manufacturer plus its dealers and other agents (or any subset of the members of the corporate family) do not constitute an enterprise within the meaning of the statute.

*Id.* at 228.

This principle was reaffirmed just a few months ago in *Emery v. American General Finance, Inc.,* 134 F.3d 1321 (7th Cir.1998). The plaintiff alleged that the RICO person, a consumer lending company, conducted the affairs of an enterprise consisting of both its subsidiaries and its parent corporation through a pattern of mail fraud. The court held that plaintiff failed to state a RICO claim. *Id.* at 1324. Including the corporate parent in the enterprise did not provide the requisite distinctness because the real perpetrators, as identified in the complaint, were the subsidiaries in the enterprise. The RICO person's sole involvement was its status as their parent corporation. *Id.* Following *Fitzgerald,* the court reminded the plaintiff that alleging a parent company as the RICO person when the enterprise consists of its subsidiaries is rarely a successful pleading practice:

> Whether AGFC [the RICO person] operated through divisions ... or through wholly owned subsidiaries is a difference unrelated to any goal or policy of RICO.... The parent would be exercising power that is inherent in its ownership of wholly owned subsidiaries. There is no allegation that by using subsidiaries rather than divisions the AGF group somehow made it easier to commit or conceal the fraud of which the plaintiff complains.

*Id.*

Norwest contends that this case falls within the *Richmond–Fitzgerald* line of decisions [9] and outside of *Haroco.* Essentially, Norwest argues that the NC and NC-led

---

**9.** Norwest did not cite *Emery,* which was decided a month after the parties completed briefing on Norwest's motion to dismiss.

corporate group enterprises were pled to create the illusion of distinctness, when in fact there is no meaningful difference between Norwest and its parent corporation or the corporate group. Norwest maintains that *it* is the real alleged perpetrator, which imposed the allegedly fraudulent proof of claim and property inspection fees while conducting its own affairs, not the affairs of a distinct enterprise. Thus, plaintiffs allegedly cannot show distinctness because they "do[ ] nothing more than describe the way in which virtually all corporate groups necessarily function." Def. Br. at 10.

This argument fails because it misapprehends the pleading errors of the *Richmond, Fitzgerald,* and *Emery* plaintiffs. The complaints in those cases were not defective simply because the RICO person and enterprise were related corporate entities functioning in a hierarchical structure. Rather, they failed because either (1) the entities in the RICO enterprise did not have a role in facilitating or masking the RICO person's alleged fraud or (2) the RICO person had no role in the alleged fraud perpetrated by its agents. Consequently, the RICO persons in these cases were held to be conducting only their own affairs. As shown in *Fitzgerald* and *Emery,* the problem in general with parent-person and subsidiary-enterprise pleading is that subsidiaries conduct the affairs of their parent, *see Haroco,* 747 F.2d at 402, not vice versa.

■ That said, the allegations in this case do not suffer from the *Richmond–Fitzgerald–Emery* maladies. First, by making the subsidiary (Norwest) the RICO person and the parent (NC) and its corporate group the enterprises, plaintiffs place this case squarely within *Haroco.* Under *Haroco* (and as confirmed by *Richmond* ), a subsidiary is presumptively (and perhaps conclusively) distinct from its parent. *See* 747 F.2d at 402; *see also Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 348–49 (N.D.Ill.1997) ("the Seventh Circuit has clearly indicated that subsidiary corporations are separate entities that 'conduct the affairs of' their parent corporations") (citations omitted); *Butler v. Platte Valley Mortgage Corp.,* 1995 WL 875412, at

*2 (N.D.Ill. Oct.25, 1995) (citing *Haroco* for the same proposition).

Second, the allegations read liberally under Fed.R.Civ.P. 8(a) demonstrate that the NC enterprises (unlike those in *Richmond* and *Fitzgerald* ) did have some part in masking or facilitating the unauthorized fee scheme, and that Norwest (unlike the RICO person in *Emery* ) had its own distinct role. The complaint forthrightly alleges that Norwest is responsible for devising and implementing the alleged scheme to defraud. NC, meanwhile, delegated its mortgage servicing line of business to Norwest, enabling Norwest to implement its allegedly illicit design to charge bankrupt borrowers illegal fees under the claimed authority of the mortgage contracts. In short, the legitimate mortgage servicing business delegated by NC allegedly masked Norwest's fee scheme. Moreover, the fruits of this fraud were allegedly upstreamed to NC and reported on NC's financial statements—statements that begot capital investments that NC in turn used to fund Norwest's operations, including its nefarious mortgage service fee collection business. As such, the fraud did not "begin and end" with Norwest; rather, it integrally involved NC, which delegated the mortgage servicing scheme to Norwest and financed its continued operation.

Norwest nevertheless maintains that NC's delegation-financing role is not sufficient to make the alleged unauthorized fee collection scheme an affair of the enterprise, as opposed to Norwest's own affair. In support of this argument, Norwest cites to four district court cases from this Circuit: *Ewing v. Midland Fin. Co.,* 1997 WL 627644 (N.D.Ill. Sept.26, 1997); *Chamberlain Mfg. Corp. v. Maremont Corp.,* 919 F.Supp. 1150 (N.D.Ill. 1996); *Moore v. Fidelity Fin. Servs., Inc.,* 897 F.Supp. 378 (N.D.Ill.1995) (*Moore I* ); *Moore v. Fidelity Fin. Servs., Inc.,* 949 F.Supp. 673 (N.D.Ill.1997) (*Moore II* ). Careful analysis, however, shows that these cases either are factually distinguishable or apply pleading standards inconsonant with the Federal Rules of Civil Procedure and the law in this Circuit.

*Chamberlain Mfg. Corp. v. Maremont Corp.* and *Ewing v. Midland Fin. Co.* are

inapposite because their RICO claims involved parent corporation RICO persons, enterprises that included subsidiary-agents, and facts that belied any finding of distinct roles for both. In *Chamberlain*, the plaintiff alleged that the parent person conducted the affairs of an enterprise consisting of itself and its subsidiary by committing fraud in connection with the sale of its subsidiary. The court held that the parent's sale of the subsidiary was merely its own affair, "not [the affair] of a separate and distinct entity made up of the parent and subsidiary combined." 919 F.Supp. at 1158. *Haroco*, the court said, was distinguishable because it "dealt with a scenario in which the subsidiary was the person and the parent was the enterprise ... and the rule of distinct legal entities is much more difficult to apply where the enterprise is an association-in-fact which lacks its own identity or form under the law ...." *Id.* at 1158. Even if the enterprise could be viewed as legally distinct from the RICO person, explained the court, the two did not perform district roles in the fraudulent concealment. *Id.* As explained above, however, we cannot differentiate the case at bar from the pleading structure in *Haroco*, and we have found that plaintiffs' complaint adequately sets forth distinct roles for Norwest and the NC enterprises.

*Ewing*, like *Chamberlain*, involved a parent RICO person and a subsidiary-enterprise, but this time, the parent-person's lack of involvement in the alleged scheme (loan fraud) prevented a finding of distinctness. 1997 WL 627644, at *5–*7. The court recognized that it is "generally inappropriate to define an 'enterprise' as composed of the employees, agents or subsidiaries of the corporate 'parent.'" *Id.* at *6 (citing *Fitzgerald*, 116 F.3d at 226–28). To meet the distinctness requirement in this situation, the plaintiff "must further distinguish between the corporate entities by alleging how each played a distinct role within the purported scheme", not "merely plead[ ] that the parent corporation set the proscribed policy and that the subsidiary subsequently acted on its behalf ...." *Id.* at *5 (citations omitted). Because the complaint alleged that the parent person simply continued the challenged corporate policies of its predecessor and conducted a financing business through its agent subsidiaries, it failed to establish a distinct role for the parent in the alleged scheme.

In contrast, the corporate person in this case is not acting through its agents in the enterprise—a parent is not the agent of its subsidiary. This in itself makes a world of difference in easing the plaintiffs' burden of pleading distinctness. And, unlike the corporate parent-person in *Ewing*, Norwest is not alleged to have simply directed the corporate family's normal affairs or "set policy"; instead, plaintiffs claim that it directly perpetrated fraud upon its customers. There is a distinct role for the enterprise as well—NC allegedly delegated Norwest the mortgage servicing line of business and financed it.

*Moore I* and *Moore II* are more factually analogous to this case—they involve subsidiary persons who allegedly directed the affairs of corporate groups headed by their parents. But these decisions fail to mention *Haroco* and appear to apply heightened pleading requirements inconsistent with the law in this Circuit.

In *Moore I*, plaintiff alleged that the subsidiary person (a financial services company) committed fraud through a forced-placed insurance scheme. Two of the enterprises were headed by the parent and indirect parent, both of which allegedly delegated their consumer loan servicing business to the subsidiary and benefitted from the subsidiary's forced-placed insurance fraud by reaping the profits. The court held these allegations failed to state a RICO claim for two reasons: (1) they failed to allege a common purpose of "engaging in a prohibited course of conduct" because the parent-enterprises played no direct role in foisting the forced-placed insurance on the plaintiff (citing *Richmond*, 52 F.3d at 644); and (2) pleading that the enterprise entities "delegated" the loan servicing operation to the subsidiary was too "nebulous and vague." *Id.* at 380.

*Moore I* does not defeat the complaint in this case. First, we note that the Seventh Circuit has never required that the enterprise be comprised of entities that share a purpose of engaging in a *prohibited* course of conduct. The *Richmond* decision states only

that the enterprise must be joined for the common purpose "of engaging in *a* course of conduct," 52 F.3d at 644 (emphasis added), which, as explained in section II.A. is easily met when the enterprise is a corporation or a corporate group. Second, *Moore I* ignores *Haroco* and the fact that *Richmond* distinguished itself from the *Haroco* prototype which, like *Moore I*, involves subsidiary persons and parent enterprises. Third, we do not believe alleging that the enterprise delegated and financed the line of business that the RICO person later perverted to accomplish a fraudulent purpose is too vague under the liberal 12(b)(6) and 8(a) standards established in this Circuit. The issue is whether the plaintiff can state a RICO claim under any set of facts consistent with the complaint. Pleading this delegation and finance role is perfectly consistent with claiming that the enterprise had a distinct role in the alleged scheme to defraud. *See Butler*, 1995 WL 875412, at *3 (parent-enterprise's delegation of mortgage-servicing responsibilities that subsidiary deployed to commit fraud is "neither nebulous, nor open-ended"); *Miller v. Chevy Chase Bank*, 1998 WL 142394, at *2 (N.D.Ill. Mar.24, 1998) (same).

*Moore II* is even less convincing. After *Moore I*, the plaintiff amended his complaint to allege several enterprises headed by the corporate parents of two subsidiary RICO persons, and included detailed descriptions of the parents' corporate structure, as well as the subsidiary-persons' and parents' roles within that structure. 949 F.Supp. at 678. The court rejected this as an attempt to " 'circumvent the distinctiveness requirement by alleging enterprises that are merely combinations of individuals or entities affiliated with the defendant corporation.' " *Id.* (quoting *Brittingham v. Mobil Corp.*, 943 F.2d 297, 301–02 (3d Cir.1991)). Relying on *Fitzgerald*, which involved the converse situation of a parent person and subsidiary enterprise—and failing to mention *Haroco* at all—the court concluded that the two subsidiaries were "merely conducting their own corporate affairs" in advancing the forced-placed insurance scheme. *Id.* at 678–79. We find this analysis unpersuasive in light of the clear authority of *Haroco*—which remains good law in this Circuit absent any negative com-

mentary—that a person subsidiary is "certainly a legal entity distinct from its parent." 747 F.2d at 402.

In sum, we find that plaintiffs have satisfied the distinctness requirement at the pleading stage. Norwest is legally distinct from its parent, NC, and the complaint alleges that each entity played a distinct role in the alleged fee fraud.

## C. The Complaint Meets the Operation and Management Test

■ The final step to fulfilling the "conduct of an enterprise" requirement is demonstrating that the RICO person actually "participate[d] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Thus, after establishing that the person and enterprise each had a distinct part to play in the alleged RICO scheme, the plaintiff must show that the person's role rose to the level of exercising some control over the enterprise's affairs. The requisite level of control has been defined by the Supreme Court in *Reves v. Ernst & Young*, the seminal decision interpreting section 1962(c)'s "conduct or participate in the conduct of an enterprise" language, as "some part in directing the enterprise's affairs." *Id.* at 179.

The *Reves* Court applied this standard to hold that the defendant accountants (RICO persons) who drafted financial statements for a corporate enterprise did not have any part in directing the enterprise because the statements were based solely on information provided by corporate management. *Id.* at 186. Far from being operators or managers, the accountants were "outsiders." *See id.* at 185. Quashing any lower courts' temptation to interpret this holding as limiting liability to high-ranking corporate management, the Court emphasized that its "operation or management test" encompasses subordinates if these "lower rung participants" were "under the direction of upper management." *Id.* at 184. Courts have used this language to reach companies acting at the behest of associated entities, *see, e.g., MCM Partners, Inc. v. Andrews–Bartlett & Assocs.*, 62 F.3d 967,

979 (7th Cir.1995), as well as subsidiaries operating a line of business delegated to them by their corporate groups, *see, e.g., Miller v. Chevy Chase Bank,* 1998 WL 142394, at *3 (N.D.Ill. Mar.24, 1998).

■ Still, subsidiary "persons" involved with parent "enterprises" do not as readily meet this "operation or management" test as they do the distinctness requirement. If *Haroco* were the only relevant authority, perhaps they would. Along with ruling that subsidiaries are "certainly" distinct from their parents, the *Haroco* court announced that "it is virtually self-evident that a subsidiary acts on behalf of, and thus conducts the affairs of, its parent corporation." 747 F.2d at 402–03. The Seventh Circuit's later decision in *Fitzgerald v. Chrysler Corp.,* however, pointed out that this proposition has been undermined by *Reves:*

> Our decision in *Haroco* allowed the subsidiary to be deemed the RICO "person" conducting the affairs of its parent through a pattern of racketeering activity, without requiring ... that the subsidiary participate in the control of the parent.... But that requirement was later imposed by the Supreme Court [in *Reves* ].

116 F.3d at 227 (citations omitted). Consequently, after *Reves,* plaintiffs must make a factual showing of some participation in controlling the parent-enterprise's affairs; subsidiaries are no longer presumed to do so.

In determining whether a plaintiff has adequately alleged that the RICO person played some part in directing the enterprise's affairs, the Seventh Circuit has used a "paradigm" approach. That is, the court compares the facts before it to "the prototype situation to which the [RICO] statute is addressed" to ascertain whether they bear a "family resemblance." *Fitzgerald,* 116 F.3d at 227; *see Emery,* 134 F.3d at 1324. The purpose of this exercise is to avoid absurd applications

of the statute. *Fitzgerald,* 116 F.3d at 226–27. Judge Posner described the analytical process:

> The prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less readily discovered, criminal acts than he could do in his own person, that is, without channeling his criminal activities through the enterprise that he has taken over ....

> A step away from the prototypical case is one in which the criminal uses the acquired enterprise to engage in some criminal activities but for the most part is content to allow it to continue to conduct its normal lawful business—and many of the employees of the business may be unaware that it is controlled and being used by a criminal.... In the next step beyond that, and now coming as close to this case as any case has yet done, the criminal seizes control of a subsidiary of a corporation and perverts the subsidiary into a criminal enterprise that manages in turn to wrest sufficient control or influence over the parent corporation to use it to commit criminal acts; and the issue is whether the subsidiary can be deemed the RICO "person."

*Id.* at 227. Noting that *Haroco* permitted just such an arrangement, the court questioned whether it would withstand *Reves'* demand that the subsidiary be shown to have actually participated in the control of the parent's operations.[10] *Id.*

Given this authority, plaintiffs' satisfaction of the *Reves* operation and management test presents a close question in this case. Norwest contends that allegedly using a NC-delegated line of business to commit fraud that produced profits for the entire corporate

---

**10.** Ultimately, the facts in *Fitzgerald* failed to satisfy *Reves* under the paradigm analysis. The plaintiff did not allege that Chrysler used its dealers and subsidiaries in a way that resembled any of the prototypes: Chrysler did not wrest control of these entities and use them to commit criminal acts; it was simply exercising its inherent power to do business through its agents. 116 F.3d at 227–28. The same result obtained in

*Emery,* which involved a parent person alleged to have conducted the affairs of its subsidiary constituents in the enterprise: "The parent would be exercising power that is inherent in its ownership of wholly owned subsidiaries. There is no allegation that by using subsidiaries ... [the parent] somehow made it easier to commit the fraud of which the plaintiff now complains." 134 F.3d at 1324.

group does not show Norwest had any part in *directing* NC and the corporate group. Rather, Norwest argues, these allegations "simply describe how a large corporation . . . can be structured to engage in various business activities." Def.'s Reply at 3. We agree that committing fraud in connection with a delegated line of business that produces financial benefits to the parent and affiliated corporations stretches *Fitzgerald*'s RICO prototypes to their very limits. We are hard-pressed to say that Norwest's conduct bears a family resemblance to the situation in which "the criminal seizes control of a subsidiary of a corporation and perverts the subsidiary into a criminal enterprise that manages in turn to wrest sufficient control or influence over the parent corporation to use it to commit criminal acts." 116 F.3d at 227.

■ Yet the complaint clearly does more than set forth a possible corporate structure for doing business. It explains how one of the entities in that corporate structure allegedly carved out a legitimate line of business and used it as a front to perpetrate fraud. Read broadly, the allegations fit (if somewhat loosely) into the *Fitzgerald* prototype in which the "criminal uses the acquired enterprise to engage in some criminal activities but for the most part is content to allow it to continue to conduct its normal lawful business." *Id.* Plaintiffs claim that NC is a large, diverse company with numerous legitimate lines of business, including mortgage servicing. Norwest allegedly took control of this aspect of NC's business and employed it to engage in a pattern of racketeering activity. This activity, in turn, served as a means of financing the corporate group's operations and obtaining market capitalization. This is sufficient under the liberal federal pleading standards to establish that Norwest played some part in directing the enterprise's affairs—here, the corporate group's mortgage servicing business and financing. Our holding is supported by a recent district court decision that post-dates *Fitzgerald* and *Emery* and reconciles their paradigm analyses with its conclusions.

In *Miller v. Chevy Chase Bank*, 1998 WL 142394 (N.D.Ill. Mar.24, 1998), Judge Zagel held that a subsidiary RICO person who used its delegated mortgage servicing powers to commit escrow fraud was a "lower-rung participant" directing the affairs of its corporate-group enterprise. Like the plaintiffs in this case, Miller alleged that Chase (the defendant subsidiary) had been delegated responsibility for servicing the mortgages at issue by its parent and affiliates in the corporate enterprise. *Id.* at *3. Miller likewise claimed that Chase used this responsibility to engage in mortgage servicing fraud, "upstreamed" the income from this activity to the corporate group enterprise, and that the corporate group raised capital based on financial statements reporting this income. *Id.* This adequately pled Chase's direction over the enterprise: "Chase is clearly a lower-rung participant in the alleged corporate scheme that includes it, and it directs the affairs of its parents and affiliates by determining how much to demand in escrow payments on the mortgages it services." *Id.; see also Goss v. Alliance Mortgage Co.*, 1997 WL 119918, at *2 (N.D.Ill. Mar.14, 1997) (holding that subsidiary-person directed enterprise's affairs by using its delegated authority over the parent's mortgage servicing business to fraudulently hold excessive escrow payments). Norwest similarly directs the NC corporate group's affairs by using its delegated discretion in the mortgage servicing business to determine what fees to charge bankrupt borrowers.

*Miller* also explained that its facts molded to the *Fitzgerald* and *Emery* prototypes, and that *Emery*, in particular, was distinguishable for the RICO persons' lack of control over the alleged fraud in that case:

> In *Emery* the court noted that *Fitzgerald* stood for the proposition that a firm must use its subsidiaries (and, presumably, vice versa) in a manner similar to the paradigmatic RICO case in which a criminal obtains control of a legitimate firm and uses that firm as the instruments of his criminality. Under the facts as alleged in *Emery*, the defendants did not control the frauds that constituted the RICO violations. They merely devised them. In the words of the Seventh Circuit, the *Emery* defendants did not allegedly have their "own little bailiwick" carved out from the

legitimate corporate hierarchy. As I discussed above, that is not the case here. The Millers have alleged that Chevy Chase controlled the fraudulent escrowing practices for Chase's, its parents, and its affiliates' benefits, distinguishing the Millers' allegations from those in *Emery*.

*Id.* at *4. Just as Chase controlled the fraud that benefitted the enterprise, Norwest allegedly directed the illicit fee scheme that "up-streamed" profits to the entire corporate group and provided the means for the group's capitalization.

We find that *Miller* reaches the appropriate conclusion under the pleading standards applicable at this stage of the litigation. Nevertheless, the case before us comes dangerously close to what *Fitzgerald* might characterize as an "absurd application" of the RICO statute. It requires us to equate exercising delegated authority that produces some financial benefit to affiliated corporate entities with directing those companies' affairs. This is a logical stretch, to say the least. In addition, we are troubled by the insertion of RICO claims into what would otherwise be a garden-variety breach-of-contract or (perhaps) fraud case. But because RICO jurisprudence has evolved to permit RICO claims in a wide range of cases that have nothing to do with organized crime, and because the allegations before us are consistent with showing that Norwest had some part in directing the affairs of NC and its corporate-group enterprise, we must retain Count I. Plaintiffs' burden will increase substantially should it later face a motion for summary judgment.

### III. Count II—Plaintiffs' RICO Claims Against the John Does

Plaintiffs' RICO claim in Count II is another story. The Seventh Circuit's decision in *Emery v. American General Fin. Co.,* 134 F.3d 1321, 1324–25 (7th Cir.1998), commands that we dismiss it.

Count II incorporates Count I's RICO allegations against "John Does 1–10," identified as corporate officers of Norwest. According to the complaint, John Does 1–10 are "personally knowledgeable and responsible for the fraudulent practices described herein,"

Complt. ¶ 3, and "devised and implemented" the scheme. Complt. ¶ 56. They allegedly conducted the affairs of three enterprises through this activity: (1) Norwest, (2) NC, and (3) the corporate group headed by NC. *Id.* ¶ 55.

Plaintiffs point out, correctly, that they are permitted to bring claims against defendants whose identities are unknown. *See, e.g., Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics,* 403 U.S. 388, 390 n. 2, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). To target pseudonymous defendants under the Federal Rules of Civil Procedure, the "pleadings must be sufficiently detailed so as to provide notice to opposing parties of the claims against them." *Hastings v. Fidelity Mortgage Decisions Corp.,* 984 F.Supp. 600, 605 (N.D.Ill.1997) (citing *Vicom v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 775 (7th Cir.1994); CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1215 (2d ed.1990)). Plaintiffs are also accurate in stating that corporate officers are distinct from the corporations that they run, and, as such, may be liable under RICO as "persons" conducting the affairs of an enterprise comprised of the corporation that employs them. *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 269 (3d Cir.1995) ("In sum, we conclude that when officers and/or employees operate and manage a legitimate corporation, and use it to conduct ... a pattern of racketeering activity, those defendant persons are properly liable under § 1962(c)"); *Emery,* 134 F.3d at 1324 (distinguishing *Jaguar Cars* but acknowledging that "the result ... was correct"). Where plaintiffs fumble the ball is in advancing the following argument:

> Although the names of the John Doe defendants in Count II remain unknown, plaintiff has alleged what cannot be disputed: that certain natural persons approved and directed the activities at issue. Clearly [Norwest] did not adopt policies and practices without human intervention. The persons obviously exist, and plaintiff has issued discovery to identify them.

Pls.' Resp. Br. at 3. *Emery* rejected this argument as insufficient to allege control over the enterprise's affairs.

After dismissing the plaintiff's claim against the corporate defendant for failing to satisfy the distinctness and control requirements, the court turned to the plaintiff's claim against John Does 1–10, unnamed corporate officers alleged to be "the individuals responsible for devising the policies used [by] each" of the corporate defendants. 134 F.3d at 1324 (citing plaintiff's complaint) (internal quotations omitted). The court began by repudiating the practice of routinely adding a John Doe count in RICO cases against corporate defendants:

> [I]t is one thing to allege that criminals are using a corporation to commit crimes ... and another to assert merely that since the corporation's unlawful scheme must have been hatched by someone connected to the corporation, the scheme ... violates RICO. Corporations can act only through natural persons, so the approach that we are criticizing ... would eliminate any separate function for the "conducts the affairs of through" language of the statute if the perpetrator is a firm.

*Id.* at 1324–25. It emphasized that plaintiffs must at least allege that the individual defendants actually "control[led] the corporation alleged to have committed the frauds that constitute the RICO violation, or a corporate division or other identifiable branch or unit that they somehow carved out from the legitimate corporate hierarchy and made their own little bailiwick." *Id.* at 1325. The court clarified that the persons who commit the illegal acts are not liable under RICO unless they are in a position to exert control over the corporation—absent control, the employee ceases to be distinct from its corporate employer. *Id.* The court expressed doubts that suing John Does could accomplish this objective, opining that "plaintiff's inability to identify any actual corporate officers or employees as responsible parties shows that she is trying to truncate the statute in the manner that strikes us as inadmissible." *Id.*

▮ Plaintiffs' complaint is equally devoid of allegations that the John Does were in positions of control. All we know is that they are corporate officers who are allegedly "personally knowledgeable and responsible" for "devising and implementing" the practice of imposing unauthorized fees on bankrupt Norwest borrowers. But this does not amount to control over Norwest or any of its divisions, nor does it adequately allege that these individuals sliced off a once-legitimate Norwest unit and transformed it into their own "bailiwick." Indeed, these allegations succeed only in claiming that the John Does had a hand in committing the allegedly fraudulent acts—an assertion that fails to distinguish the John Does' role sufficiently from Norwest's to hold them personally liable. *See id.* at 1325. As such, we dismiss Count II for failure to plead the requisite level of control over the enterprise.

The dismissal is without prejudice, however. If plaintiffs can plead, in a manner that satisfies both *Emery* and Fed.R.Civ.P. 11, that the John Does occupied positions of control at Norwest, they may amend their complaint accordingly. In light of this dismissal, we also deny without prejudice the plaintiffs' pending Motion to Identify and Serve John Does 1–10 Instanter. In the event that plaintiffs present an acceptable amendment consistent with this opinion, the Court may reinstate this motion.

Having addressed Norwest's motion to dismiss the RICO claims, we move on to the parties' cross-motions for summary judgment on the contract interpretation issue. As we shall see, our ruling on this issue has potentially grave consequences for plaintiffs' RICO claims.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the

nonmoving party, and draw all reasonable inferences from the evidence in the nonmovant's favor. *Cincinnati Ins.,* 40 F.3d at 150. But if the evidence is merely colorable, or is not significantly probative, or just raises "some metaphysical doubt as to the material fact," summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 261, 106 S.Ct. 2505; *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making its determination, the court's sole function is to decide whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505.

When the parties submit cross-motions for summary judgment, the court is not required to grant judgment as a matter of law for one side or the other. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993). The court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Id.; Buttitta v. City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd,* 9 F.3d 1198 (7th Cir.1993). This is more of a semantic exercise here because both parties' motions spotlight the same purely legal issue: did the mortgage contracts authorize property inspection and proof of claim fees?

## ANALYSIS—CONTRACT INTERPRETATION ISSUE

### I. Contract Interpretation Under Illinois Law

Before we interpret the mortgage contracts, we must ascertain the applicable law. The Security Instrument provides that it "shall be governed by federal law and the law of the jurisdiction in which the Property is located." (¶ 15) The Majchrowskis' property is located in Illinois, which means Illinois contract interpretation principles apply here.

Summary judgment is particularly appropriate for resolving contract interpretation disputes. *Murphy v. Keystone Steel & Wire Co.,* 61 F.3d 560, 564–65 (7th Cir.1995). The threshold question of law for the court is whether the contract is ambiguous. *Ford v. Dovenmuehle Mortgage, Inc.,* 273 Ill.App.3d 240, 244, 209 Ill.Dec. 573, 651 N.E.2d 751, 754 (1st Dist.1995). Ambiguity does not exist simply by virtue of the parties' disagreement over a provision's meaning. *Frydman v. Horn Eye Ctr.,* 286 Ill.App.3d 853, 858, 222 Ill.Dec. 151, 676 N.E.2d 1355, 1359 (1st Dist.), *appeal denied,* 173 Ill.2d 524, 226 Ill.Dec. 132, 684 N.E.2d 1335 (1997); *Ford,* 273 Ill.App.3d at 244, 209 Ill.Dec. 573, 651 N.E.2d at 754; *USG Interiors, Inc. v. Commercial & Architectural Prods., Inc.,* 241 Ill.App.3d 944, 949, 182 Ill.Dec. 277, 609 N.E.2d 811, 815 (1st Dist.1993). Both parties' interpretive positions must be reasonable for the court to find an ambiguity, and the party asserting ambiguity has the burden of demonstrating it through "objective facts, not subjective and self-serving testimony." *Murphy,* 61 F.3d at 565; *see Ford,* 273 Ill. App.3d at 244, 209 Ill.Dec. 573, 651 N.E.2d at 754. If the court finds the contract ambiguous, then it may consider evidence extrinsic to the contract terms. *Diversified Tech. Group,* 887 F.Supp. at 1088 (citations omitted).

But when the contract is deemed unambiguous, the court must discern its meaning solely "by looking at words used and cannot interpret the contract in a way contrary to the plain and obvious meaning of those words." *Klemp v. Hergott Group, Inc.,* 267 Ill.App.3d 574, 580, 204 Ill.Dec. 527, 641 N.E.2d 957, 962 (1st Dist.1994); *see USG Interiors,* 241 Ill.App.3d at 947–48, 609 N.E.2d at 814 (when faced with "clear and explicit" language, court must "derive the parties' intent and the meaning of the instrument solely from the writing itself" and "cannot interpret the contract in a way which is contrary to the plain and obvious meaning of these words."). The court must view the document as a whole, and read related documents together. *Murphy,* 61 F.3d at 565. "Clear and unambiguous contract terms must be given their ordinary and natural meaning, and no parol or extrinsic evidence may be

considered to vary the meaning of the terms." *Frydman,* 286 Ill.App.3d at 858, 222 Ill.Dec. 151, 676 N.E.2d at 1355; *Ford,* 273 Ill.App.3d at 245, 209 Ill.Dec. 573, 651 N.E.2d at 755 (court must "giv[e] the words of the contract their common and generally accepted meaning"); *USG Interiors,* 241 Ill.App.3d at 949, 182 Ill.Dec. 277, 609 N.E.2d at 815 (same). "The rights of parties to a contract are limited by the terms expressed in the contract; a court will not rewrite a contract to suit one of the parties, but will enforce the terms as written." *Wright v. Chicago Title Ins. Co.,* 196 Ill.App.3d 920, 925, 143 Ill.Dec. 576, 554 N.E.2d 511, 514 (1st Dist.1990); *Frydman,* 286 Ill.App.3d at 858, 222 Ill.Dec. 151, 676 N.E.2d at 1355 ("A court cannot rewrite a contract to provide a better bargain to suit one of the parties.").

## II. The Parties' Arguments

The parties' cross-motions for partial summary judgment dispute whether the mortgage contracts authorize imposing property inspection and proof of claim fees on bankrupt borrowers. Plaintiffs first advance an *expressio unius est exclusion alterius* argument, pointing out that the contracts are very specific about the fees Norwest may assess to the borrower, yet omit any mention of charges for property inspections or preparing proofs of claim. Norwest rejoins that the agreements afford it expansive remedies in the case of borrower default and bankruptcy, in language broad enough to encompass property inspection and proof of claim fees. Plaintiffs next cite to a number of bankruptcy decisions that they claim hold property inspection and proof of claim fees *per se* improper. Norwest, however, argues that these cases are inapposite because they involved mortgage contracts whose language did not permit such fees. Finally, plaintiffs contend that the property inspection fees are void for an independent reason: Norwest never gave the Majchrowskis an inspection notice as the Security Instrument requires. Norwest's answer is that the notice provision is a separate covenant whose breach does not affect the enforceability of the independent provision authorizing Norwest to "do and pay for whatever is necessary to protect the val-

ue of the Property and the Lender's rights in the Property."

We find that the plaintiffs' arguments lack merit. First, their position rests on an unreasonable interpretation of the mortgage contracts, which we find to be unambiguous as a matter of law. Second, we agree with Norwest that plaintiffs' bankruptcy cases are inapposite. Third, any breach of the Security Instrument's property inspection notice provisions does not affect Norwest's ability to charge property inspection fees as part of its powers of self-protection against defaulting and bankrupt borrowers. We elaborate on these conclusions below.

## III. The Security Instrument Authorizes Property Inspection and Proof of Claim Fees

■ Plaintiffs do not seriously contend that the mortgage contracts are unambiguous. Rather, they focus on the fact that the agreements do not use the words "property inspection fees" or "file proof of claim fees," but specify in detail many other types of fees the Lender can impose if certain conditions are met. This *expressio unius* argument, however, is defeated by the Security Instrument's plain language in paragraph 7:

**Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy ...), then Lender *may do and pay for whatever is necessary* to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs....

*Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower* secured by this Security Instrument.... (¶ 7) (emphasis added)

When the borrower breaches any covenant in the Security Instrument or goes into bank-

ruptcy, this language unequivocally permits the lender to take whatever action is necessary to (1) protect the mortgaged property's value and (2) the lender's rights in the property. Under these circumstances, the lender has full authority to pay for these actions and then charge them to the borrower. There is no limitation on what the lender may do and pay for except that it must be necessary to protect its rights in or the value of the property. The lender's actions do not, for example, have to be reasonable, economical, or fair to the borrower.

We interpret this language to authorize fees that (1) Norwest actually incurred in filing a proof of claim in the plaintiffs' bankruptcy, as well as (2) property inspection fees actually incurred because of plaintiffs' default and bankruptcy. This conclusion is supported by several factors. First, plaintiffs admit that they defaulted on the mortgage loan (a breach of the Security Instrument's provision requiring prompt payment in ¶ 1) and that they filed for bankruptcy. Second, they do not challenge Scott Walker's affidavit testimony that filing the proof of claim was necessary to protect Norwest's rights in the property and that inspecting the Majchrowski's property was necessary to protect both its rights in and the value of the property. Plaintiffs contest only whether Norwest "actually incurred" these fees—but this is a factual question that is not relevant to whether the mortgage contracts authorize the fees. Thus, Norwest has met all the prerequisites to "doing and paying."

■ Third, the "do and pay for whatever is necessary" language is followed by the sentence "Lender's actions may *include* ... appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs." (emphasis added). It is well-settled that the term "include" is one "of enlargement, not limitation." *Paxson v. Board of Educ.*, 276 Ill.App.3d 912, 920, 213

Ill.Dec. 288, 658 N.E.2d 1309, 1314 (1st Dist. 1995); *see Gem Elec. v. Department of Revenue*, 286 Ill.App.3d 660, 667, 222 Ill.Dec. 52, 676 N.E.2d 1016, 1021 (4th Dist.1997) ("The words 'include' or 'including' are ordinarily terms of enlargement rather than restriction and indicate that items enumerated in a statute are not meant to be exclusive."). Consequently, the absence of the words "property inspection fees" or "proof of claim fees" from the list does not mean they are unauthorized. Indeed, they are similar enough to the listed examples to be encompassed under the venerable interpretive canon *ejusdem generis*. "The doctrine of *ejusdem generis* provides that when a statute lists several classes of persons or things but provides that the list is not exhaustive, the class of unarticulated things will be interpreted as those 'others such like' the named persons or things." *Board of Trustees v. Department of Human Rights*, 159 Ill.2d 206, 201 Ill.Dec. 96, 636 N.E.2d 528, 531 (1994). Filing a proof of claim asserts the creditor's rights in a bankruptcy proceeding, and thus approximates "appearing in court"; likewise, property inspections resemble "entering on the property to make repairs." In light of this illustrative list, the plaintiffs' *expressio unius* argument fails. See *Paxson*, 276 Ill.App.3d 912, 213 Ill.Dec. 288, 658 N.E.2d at 1314–15 (rejecting plaintiffs' *expressio unius* argument because "it is generally improper to conclude that entities not specifically enumerated are excluded when the legislature uses the word 'including.' ").

Fourth, paragraph 7 expressly permits charging these fees to the borrower if they are actually incurred. It states that "[a]ny amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument." [11]

While paragraph 7 authorizes the lender to incur and charge the borrower for proof of

---

11. Plaintiffs create much ado about nothing by arguing that the "attorneys' fees" language in paragraph 7 does not encompass the "file proof of claim fee." Plaintiffs introduce evidence that Norwest does not have its Proofs of Claim prepared by attorneys, but rather by non-lawyer employees of an on-premises law firm. Whether the proof of claim fee constitutes an attorneys'

fee is wholly irrelevant, however, in light of our ruling that "do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property" includes preparing a proof of claim and that "any amounts disbursed ... shall become additional debt of the borrower" permits charging the fee for this preparation, regardless of who does it, to the borrower.

claim and property inspection fees because of default or bankruptcy, other provisions in the Security Instrument authorize property inspection fees because of foreclosure. Paragraph 21 is titled "Acceleration; Remedies," and delineates the circumstances in which the lender has the right to commence foreclosure proceedings against a defaulting borrower. It then provides that "Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence." It is undisputed that Norwest began foreclosure proceedings against the Majchrowskis in November 1996 (stayed temporarily by the bankruptcy court), and that the Majchrowskis' loan is currently in foreclosure. Consequently, under the Security Instrument, Norwest was authorized to charge the Majchrowskis for the "foreclosure property inspection" listed in Norwest's Proof of Claim as "expenses" of "pursuing" foreclosure (one of the remedies discussed in paragraph 21), assuming that Norwest actually incurred them.

Since the contract's terms clearly and unambiguously authorize the fees at issue in this case, we reject plaintiffs' invitation to construe the agreement against the drafter under the doctrine of *contra proferentum.* This doctrine applies only when the contract is ambiguous. *Ford,* 273 Ill.App.3d at 248, 209 Ill.Dec. 573, 651 N.E.2d at 757 (*contra proferentum* "only ha[s] bearing when an ambiguity exists on the face of contractual documents"); *USG Interiors,* 241 Ill.App.3d at 949, 182 Ill.Dec. 277, 609 N.E.2d at 815 ("Where the language of the contract is clear and unambiguous, this rule of construction [construe the language against the drafter] is inapplicable."). It is apparent that the plaintiffs are seeking to have this court rewrite the contract—a concept inimical to the entire body of contract law and an undertaking we refuse. The plaintiffs must live with the agreement that they signed.

Plaintiffs nonetheless attempt to rely on a number of bankruptcy court decisions from other districts that, for various reasons, reject lenders' attempts to pass along property inspection fees or proof of claim preparation

fees. None of these decisions changes our determination that Norwest's standard form mortgage contracts authorized the fees at issue in this case. First, these decisions recognize that the lender may charge the borrower for such fees if the mortgage contract permits it. *See, e.g., In re Burwell,* 107 B.R. 62, 65 (Bankr.E.D.Pa.1989). Second, the mortgage contracts in these cases contained language that bears no resemblance to the broad authorization in Norwest's Security Instrument to pass along fees the lender incurs in protecting itself against bankrupt and defaulting borrowers. Third, these cases were decided in the context of entirely different proceedings (bankruptcy as opposed to a civil lawsuit) applying different standards and burdens of proof, and are not binding given that they issued from lower courts in other circuits. *See Burwell,* 107 B.R. at 64–67 (mortgage contract did not authorize property inspection fees because its provisions addressed only "governmental fees which may encumber the property"; placed the burden of proving that the fees were "reasonable" on the lender); *In re Cole,* 122 B.R. 943, 946 (Bankr.E.D.Pa.1991) (same contract as in *Burwell;* followed *Burwell* in excising property inspection fee); *In re Rorie,* 98 B.R. 215, 221 (Bankr.E.D.Pa.1989) (disallowing property inspection fee because no contractual provision imposed it).

The plaintiffs' proof of claim fee cases are distinguishable for an additional reason: they all deal with the propriety of hiring an attorney to prepare the claim and then charging the borrower at the attorneys' rates—an issue absent from this case if plaintiffs are correct that Norwest hired non-lawyers to draft its proofs of claim. *See In re Banks,* 31 B.R. 173, 176–78 (Bankr.W.D.Ala.1982) (mortgage contract language did not permit collecting fees generated by an attorney's proof of claim preparation); *In re Cipriano,* 8 B.R. 697, 699 (Bankr.D.R.I.1981) (mortgage contract simply provided that borrower must pay "reasonable attorneys' fees" in the event of collection; rejecting attorney's fee for preparing proof of claim as unreasonable); *see also In re Allen,* 215 B.R. 503, 5031997 Bankr.LEXIS 2013, at *2 (Bankr.N.D.Tex. Dec. 12, 1997) (refusing lender's fee for proof of claim prepared by attorney because lender

did not seek approval from the court; noting that "[a]ll attorneys' fees paid by debtors in bankruptcy cases must be approved by the Bankruptcy Court.").

██ Finally, we reject the plaintiffs' contention that the property inspection fees imposed under paragraphs 7 and 21 of the Security Instrument are void because Norwest does not, as a matter of practice (and did not in the Majchrowskis' case), give notice to defaulting, bankrupt borrowers before inspecting their property. Under the heading "Inspection," paragraph 9 of the Security Instrument provides that "Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection."

██ Assuming that this notice provision still applies in the case of default, foreclosure, and borrower bankruptcy (after all, paragraph 7 states that the Lender may do and pay "whatever is necessary" to protect its rights and the property's value—it does not say anything about reasonableness as paragraph 9 does), the law in this Circuit is that notice provisions are separate covenants whose breach is not material in the sense that the breaching party forgoes its rights under other provisions in the contract. The aggrieved party's remedy is limited to damages for breach of the notice provision. *See Calumet Fed. Sav. & Loan Ass'n v. Lake County Trust Co.,* 509 F.2d 913, 920–21 (7th Cir.1975) (noting with approval the district court's conclusion that "the agreement to give notice of default is merely a covenant, the breach of which would only entitle the defendant Hil–Budd to damages"; remanding for recalculation of damages). Even assuming that plaintiffs could somehow show that compliance with paragraph 9's notice provision was a condition precedent to imposing property inspection fees under paragraph 7, we would not consider it because plaintiffs have not properly alleged the failure of a condition precedent specifically and with particularity as required by Fed.R.Civ.P. 9(c). Plaintiffs have alleged only that they satisfied all conditions precedent, not that Norwest failed to fulfill one. *See Runnemede*

*Owners, Inc. v. Crest Mortgage Corp.,* 861 F.2d 1053, 1057 (7th Cir.1988) (refusing to consider plaintiff's argument that compliance with a notice provision was a condition precedent to defendant's other rights under the contract because "its complaint merely alleged that [plaintiff] had complied with its conditions precedent ... it did not allege a failure of a condition precedent ... running to [defendant] ....").

In sum, summary judgment is in order for Norwest on the contract interpretation issue. We realize our ruling that the property inspection and proof of claim fees were authorized by the mortgage contract has serious, if not fatal, consequences for plaintiffs' RICO claims, which are premised entirely on Norwest's alleged scheme to charge its customers "bogus" fees. However, because the parties' briefs did not address how our contract ruling affects the RICO counts, we decline to dismiss them out of hand. Instead, the plaintiffs should carefully review this opinion and determine how they wish to proceed with this litigation.

### CONCLUSION

For the reasons above, we deny Norwest's motion to dismiss Count I. Count II, however, is dismissed without prejudice. Along with Count II, we deny without prejudice plaintiffs' Motion to Identify and Serve John Does 1–10 Instanter. Finally, we grant summary judgment to Norwest on the contract interpretation issue, and deny plaintiffs' cross-motion for summary judgment. The parties are ordered to appear for a status hearing on June 17, 1998 at 9:00 a.m. to discuss the future of this litigation.